UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| ROD R. BLAGOJEVICH, | ) | |
| | ) | |
| Plaintiff, | ) | Case No. 21-cv-4103 |
| | ) | |
| v. | ) | Hon. Steven C. Seeger |
| | ) | |
| STATE OF ILLINOIS and | ) | |
| ILLINOIS GENERAL ASSEMBLY, | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

## MEMORANDUM OPINION AND ORDER

More than a decade ago, Governor Rod Blagojevich left the Dirksen Federal Building in disgrace. He was charged, tried, and convicted of more than ten counts of corruption. He received a sentence of 14 years, and the Seventh Circuit largely affirmed. "The evidence, much of it from Blagojevich's own mouth, is overwhelming." *See United States v. Blagojevich*, 794 F.3d 729, 734 (7th Cir. 2015).

While the charges were pending, the Illinois General Assembly took decisive action to remove him from public office. Blagojevich inspired bipartisanship. The Illinois House of Representatives impeached him by a vote of 117-1, and the Illinois Senate convicted and removed him from office by a vote of 59-0.

At that point, Blagojevich's career came to a close. The music stopped, the curtain fell, and he exited stage left.

He's back.

Blagojevich didn't have a graceful exit from public life. It was disgraceful. And by the look of things, it wasn't even an *exit*. Because Blagojevich wants back in the game, and back on center stage, microphone in hand.

Blagojevich served almost eight years in prison, before receiving a presidential commutation. After regaining his freedom, Blagojevich wants to regain the ability to represent the good people of Illinois. So he came back to the Dirksen Federal Building, hoping for a warmer reception and a new lease on political life.

Blagojevich unveiled a two-count *pro se* complaint under section 1983 and neighboring provisions, challenging the treatment that he received in the Illinois legislature. The first count seeks an injunction to "enjoin the State of Illinois and all of its component parts from enforcing

the State Senate's disqualifying provision which denies Plaintiff his right to run for office in Illinois in violation of the Sixth Amendment and the Fourteenth Amendment to the United States Constitution." *See* Cplt., at 9 (Dckt. No. 1). The second count seeks a "declaratory judgement [sic] rendering the State Senate's disqualifying provision as null and void because it violates the First Amendment rights of the voters of Illinois." *Id.*

He adds that the "people's right to vote is a fundamental right." *Id.* And by that, Blagojevich apparently means the fundamental right to vote *for him*.

The complaint is riddled with problems. If the problems are fish in a barrel, the complaint contains an entire school of tuna. It is a target-rich environment. The complaint is an Issue-Spotting Wonderland.

For starters, Blagojevich cannot sue the State of Illinois under section 1983. That statute authorizes a claim against a "person" for violating federal rights. *See* 42 U.S.C. § 1983. But a state is not a "person," as the Supreme Court explained decades ago. *See Will v. Mich. Dep't of State Police*, 491 U.S. 58, 71 (1989) ("We hold that neither a State nor its officials acting in their official capacities are 'persons' under § 1983."); *Arizonans for Official English v. Arizona*, 520 U.S. 43, 69 (1997) ("We have held . . . that § 1983 actions do not lie against a State."); *Howlett ex rel. Howlett v. Rose*, 496 U.S. 356, 365 (1990) ("[A]n entity with Eleventh Amendment immunity is not a 'person' within the meaning of § 1983."). Despite what its name might suggest, the Land of Lincoln isn't a person.

The same conclusion applies to the Illinois General Assembly. The legislature isn't a "person," either. An "arm or instrumentality of the State" cannot be sued under section 1983. *See Lewis v. Clarke*, 581 U.S. 155, 166 (2017). The Illinois General Assembly – the state legislature – is an arm of the State of Illinois. *See* Ill. Const. art. II, § 1 (describing the powers of the state as divided between "[t]he legislative, executive and judicial branches"); *see also Smith v. United States Congress*, 840 F. App'x 31, 33 (7th Cir. 2021) ("[T]he Wisconsin Legislature was not a proper defendant. As an arm of the state of Wisconsin, it is not a 'person' subject to suit under 42 U.S.C. § 1983.").

Even if Blagojevich could get his foot in the door, he wouldn't get very far before hitting his head on the constitutional architecture. The structure of the Constitution stands in his way, horizontally and vertically.

From a horizontal perspective, the separation of powers prevents a court from interfering with the business of the legislative branch when it comes to impeachments. From a vertical perspective, federalism prevents a federal court from interfering with the internal affairs of the state legislature.

Taking a step back, the Constitution entrusts different branches with different spheres of authority. Each branch must stay in its lane, and avoid overstepping the line and invading the space of the other branches. Good fences make good neighbors, and the Constitution is no exception.

Impeachment is a prime example of how the Constitution divides territory and sets boundaries. The Constitution vests the authority to remove public officials through impeachment in the hands of the legislative branch, not the judicial branch. The "sole Power" of impeachment rests with the House of Representatives, and the "sole Power" to try an impeachment rests with the Senate. *See* U.S. Const. art. I, § 2, cl. 5 ("The House of Representatives . . . shall have the sole Power of Impeachment."); *id.* art. I, § 3, cl. 6 ("The Senate shall have the sole Power to try all Impeachments.").

The Constitution vests the "Power" over impeachment in the legislative branch. *Id.* It does not take much interpretative detective work to figure out that the judiciary has no seat at the table. Congress has the "Power," and the judiciary has none. *Id.*

To cement the point, the text uses the word "sole," twice. *Id.* The Constitution isn't chock-full of adjectives, but the Framers made a point of saying that the "sole" power to impeach rests with the House, and the "sole" power to remove rests with the Senate. "Sole" is a polite way of saying that the other branches need to butt out.

The Constitution expressly entrusts impeachment to the legislature, so it implicitly divests the judiciary of any power to intervene. Decades ago, the Supreme Court held that impeachment is a nonjusticiable political question. *See Nixon v. United States*, 506 U.S. 224, 235 (1993) ("Judicial involvement in impeachment proceedings, even if only for purposes of judicial review, is counterintuitive because it would eviscerate the 'important constitutional check' placed on the Judiciary by the Framers."); *see also In re Comm. on the Judiciary, U.S. House of Representative*s, 951 F.3d 589, 599 (D.C. Cir. 2020) ("The courts cannot tell the House how to conduct its impeachment investigation or what lines of inquiry to pursue, or how to prosecute its case before the Senate, much less dictate how the Senate conducts an impeachment trial.") (internal citations omitted), *vacated and remanded sub nom. DOJ v. House Comm. on the Judiciary*, 142 S. Ct. 46 (2021); *Hyland v. Clinton*, 2000 WL 125876, at *1 (6th Cir. 2000) ("[The plaintiff's] action involves a matter that is unsuitable for judicial resolution, as the Constitution excludes judicial review of impeachments."). The judiciary must keep its nose out of another branch's business (and vice versa).[1]

---

[1] Scholars have debated whether an exception exists if Congress departs from the standard established in the Constitution itself. *See, e.g.*, Michael J. Gerhardt, *Rediscovering Nonjusticiability: Judicial Review of Impeachments After* Nixon, 44 Duke L.J. 231, 248 (1994) ("After *Nixon*, two possibilities exist for judicial review of impeachment challenges. The first is that the only justiciable challenges to impeachments are for violations of explicit constraints, while the second is that judicial review is never permissible."); Erwin Chemerinsky, Federal Jurisdiction § 2.6.8, at 191 (8th ed. 2021) ("*Nixon* leaves open the question of whether all challenges to impeachment are nonjusticiable political questions. For example, what if the president were impeached and convicted for an act that was completely lawful and within his constitutional powers?"); Edward B. Foley, *Due Process, Fair Play, and Excessive Partisanship: A New Principle for Judicial Review of Election Law*s, 84 U. Chi. L. Rev. 655, 752 n.369 (2017) ("Although the Court's opinion in *Nixon* explicitly concerns only the nonjusticiability of the Constitution's Impeachment Trial Clause itself, the Court's reasoning in the case is well understood to extend to *any* constitutional claims concerning the Senate's trial of an impeachment, on the ground that such trials are committed exclusively to the authority of the Senate.") (emphasis added); Michael J. Gerhardt, The Federal Impeachment Process 131 (2019 ed.) ("Other aspects of the Constitution counsel even more strongly against the justiciability of explicit constitutional violations in the impeachment

"To check the impeachment power, the framers quite naturally relied on the political accountability of members of Congress. Thus judges, who on so many issues have the last word, must rely on the public as the ultimate check on impeachment, itself the Constitution's explicit check on their own excesses." *See Nixon v. United States*, 938 F.2d 239, 243 (D.C. Cir. 1991); *see also* The Federalist No. 65 (Alexander Hamilton); 1 Joseph Story, Commentaries on the Constitution of the United States § 764, at 541 (Thomas M. Cooley ed., 4th ed. 1873) (1833) ("The offences to which the power of impeachment has been and is ordinarily applied as a remedy are of a political character. . . . They must be judged of by the habits and rules and principles of diplomacy of departmental operations and arrangements, of parliamentary practice, of executive customs and negotiations, of foreign as well as domestic political movements; and, in short, by a great variety of circumstances, as well those which aggravate as those which extenuate or justify the offensive acts which do not properly belong to the judicial character in the ordinary administration of justice, and are far removed from the reach of municipal jurisprudence. *They are duties which are easily understood by statesmen, and are rarely known to judges.*") (emphasis added); *see also id.* at § 803.

In fact, the Framers expressly rejected proposals to give the judiciary a role in impeachment proceedings. The Virginia Plan and the New Jersey Plan proposed giving the judiciary the power to preside over the impeachment of federal officers, and the Committee of Detail later suggested that the Supreme Court have original jurisdiction over impeachment trials. *See, e.g.*, Michael J. Gerhardt, The Federal Impeachment Process 5–6, 129–31 (2019 ed.). But in the end, the Convention rejected proposals to extend the jurisdiction of federal courts to preside over impeachment. *Id.*

"[W]hen the Constitutional Convention moved the trial of impeachments from the Supreme Court to the Senate . . . it dropped 'impeachment' altogether from the list which later became, by stylistic revision, the list defining the Article III 'judicial power.'" *See* Charles L. Black, Jr., Impeachment: A Handbook 57 (1998 ed.). "Indeed, it is possible to read the constitutional convention's debates of August 27, 1787, as settling any question about the framers' intentions to extend any kind of judicial authority, including judicial review, to impeachments. . . . [I]mpeachment is the only nonjudicial power that the framers expressly considered but declined to give to any part of the federal judiciary." *See* Michael J. Gerhardt, The Federal Impeachment Process 129, 131 (2019 ed.); *see also* Michael J. Gerhardt, *Rediscovering Nonjusticiability: Judicial Review of Impeachments After* Nixon, 44 Duke L.J. 231, 271–73 (1994); *see also* 2 Records of the Federal Convention of 1787, pp. 430–31 (M. Farrand ed. 1911).

The same principle applies at the state level, too. The Constitution and the Illinois Constitution use similar language. *Compare* Ill. Const. art. IV, § 14 ("The House of Representatives has the sole power to conduct legislative investigations to determine the existence of cause for impeachment and, by the vote of a majority of the members elected, to

---

context."). For example, the Constitution expressly requires two-thirds of the Senate to convict an official. *See* U.S. Const. art. I, § 3, cl. 6. Imagine if the Senate purported to do so with only five Senators voting. By way of analogy, Congress is in charge of seating representatives. But Congress cannot add to the requirements set forth in the Constitution itself (*e.g.*, by adding term limits). *See U.S. Term Limits, Inc. v. Thornton*, 514 U.S. 779, 838 (1995); *Powell v. McCormack*, 395 U.S. 486, 550 (1969).

impeach Executive and Judicial officers. Impeachments shall be tried by the Senate. When sitting for that purpose, Senators shall be upon oath, or affirmation, to do justice according to law."), *with* U.S. Const. art. I, § 2, cl. 5 ("The House of Representatives . . . shall have the sole Power of Impeachment."); *id.* art. I, § 3, cl. 6 ("The Senate shall have the sole Power to try all Impeachments.").

Some states do allow some degree of judicial review of state impeachment proceedings, creating a limited window of opportunity as opposed to the closed door in the federal system. *See State ex rel. Workman v. Carmichael*, 819 S.E.2d 251, 270 (W. Va. 2018); *Office of Governor v. Select Committee of Inquiry*, 858 A.2d 709, 730 (Conn. 2004); *In re Judicial Conduct Committee*, 751 A.2d 514, 517 (N.H. 2000); *but see Alabama House of Representatives Judiciary Comm. v. Office of the Governor of Alabama*, 213 So.3d 579 (Ala. 2017) (Stuart, J., concurring specially). At the end of the day, separation of powers under the Illinois Constitution is a matter of state law. *See Whalen v. United States*, 445 U.S. 684, 689 n.4 (1980).

Blagojevich has given this Court no reason to think that Illinois would be one of the states to allow judicial review. There isn't a lot of case law in Illinois. In fact, there isn't any case law. And for good reason. In its 205-year history, the Illinois General Assembly has impeached, convicted, and removed one public official: Blagojevich.

Even if Illinois courts gave the green light to judicial review as a matter of state law, it would not mean that a federal court could get involved. Justiciability in federal court is a federal question, and justiciability includes the political question doctrine. The Supreme Court in *Nixon* raised concerns about embroiling courts in political questions, and those concerns also exist when an impeachment involves a state official.

The bottom line is that the judiciary has no power to unimpeach, unconvict, and unremove a public official. The legislature taketh away, and the judiciary cannot giveth back.

The separation of powers is a horizontal barrier – it keeps the judiciary from meddling in the affairs of the legislature. But here, Blagojevich's suit hits a vertical barrier, too. That vertical barrier is federalism.

The Constitution separates power between the federal and state governments, and for good reason. "This separation of the two spheres is one of the Constitution's structural protections of liberty. Just as the separation and independence of the coordinate branches of the Federal Government serve to prevent the accumulation of excessive power in any one branch, a healthy balance of power between the States and the Federal Government will reduce the risk of tyranny and abuse from either front." *See Printz v. United States*, 521 U.S. 898, 921 (1997) (cleaned up).

"The allocation of powers in our federal system preserves the integrity, dignity, and residual sovereignty of the States. The federal balance is, in part, an end in itself, to ensure that States function as political entities in their own right." *See Bond v. United States*, 564 U.S. 211, 221 (2011).

5

The Supreme Court has cautioned federal courts against meddling with the internal affairs of state government. *See, e.g.*, *Louisiana Power & Light Co. v. City of Thibodaux*, 360 U.S. 25, 28 (1959) (discussing the need for abstention in a case about a state proceeding of a "special and peculiar nature" that involved an "aspect of sovereignty," given the need to avoid "needless friction between state and federal authorities"). The Constitution, after all, creates a scheme of dual sovereignty, and federal courts must respect those boundaries. *See Alden v. Maine*, 527 U.S. 706, 748 (1999) ("Although the Constitution grants broad powers to Congress, our federalism requires that Congress treat the States in a manner consistent with their status as residuary sovereigns and joint participants in the governance of this Nation.").

The need to avoid interference with state proceedings is a theme running through many different areas of the law. *See, e.g.*, *Babbitt v. United Farm Workers Nat'l Union*, 442 U.S. 289, 306 (1979) (noting that abstention helps "avoid unnecessary friction in federal-state relations") (citation omitted); *Mitchum v. Foster*, 407 U.S. 225, 233 (1972) (noting that the anti-injunction statute prevents "needless friction between state and federal courts"); *Monserrate v. New York State Senate*, 599 F.3d 148, 157 (2d Cir. 2010) ("Prudence dictates that a federal court should exercise a respectful reluctance to interfere in the measures taken by a state legislature to regulate its affairs, discipline its members, and protect its integrity and good name.").

At bottom, Blagojevich is asking this Court to undo a state proceeding and unwind a decision by duly elected representatives of the people of Illinois. The idea of a federal court intermeddling in the affairs of a state legislature is "startlingly unattractive." *Davids v. Akers*, 549 F.2d 120, 123 (9th Cir. 1977) (finding nothing in the Constitution "that can justify this attempt to inject the Federal Judiciary into the internal procedures of a House of a state legislature").

Blagojevich isn't asking this Court to second-guess a federal impeachment. Blagojevich is inviting this Court to get involved in a state impeachment. If intervention by a federal court in a federal impeachment is bad, then intervention by a federal court in a state impeachment is worse.

Another jurisdictional issue lurks in the background. In essence, Blagojevich is asking this Court to exercise appellate jurisdiction over a state proceeding. By analogy, under the *Rooker-Feldman* doctrine, "state-court losers" cannot run to federal court to undo what happened in state court. *See Lance v. Dennis*, 546 U.S. 459, 460 (2006) (per curiam) (cleaned up); *Exxon Mobil Corp. v. Saudi Basic Indus. Corp.*, 544 U.S. 280, 284 (2005); *E.A. v. Gardner*, 929 F.3d 922, 924 (7th Cir. 2019) ("[S]tate court losers can't come into federal court to complain that the state court judgment violates their federal rights. Otherwise federal district judges would effectively hold appellate jurisdiction over state courts, while under 28 U.S.C. § 1257 only the Supreme Court has that jurisdiction."). If state court losers can't run to the federal courthouse and challenge something that happened in state court, it is hard to see why state impeachment losers can run to the federal courthouse and challenge something that happened in the state legislature.

Standing issues loom large, too. *See* U.S. Const. art. III, § 2, cl. 1. Blagojevich seeks to protect the right of voters to cast ballots for him. But a plaintiff generally lacks standing to assert

the rights of others. *See Warth v. Seldin*, 422 U.S. 490, 499 (1975) ("[T]he plaintiff generally must assert his own legal rights and interests, and cannot rest his claim to relief on the legal rights or interests of third parties."); *Moose Lodge No. 107 v. Irvis*, 407 U.S. 163, 166 (1972) ("[A plaintiff] has standing to seek redress for injuries done to him, but may not seek redress for injuries done to others.").

Courts have held that litigants lack standing to assert the voting rights of others. *See Skolnick v. Bd. of Comm'rs of Cook Cnty.*, 435 F.2d 361, 363 (7th Cir. 1970) (holding that plaintiffs lacked standing to challenge malapportionment when they lived in overrepresented district); *Fairley v. Patterson*, 493 F.2d 598, 604 (5th Cir. 1974) (same); *Glickert v. Loop Trolley Transp. Dev. Dist.*, 792 F.3d 876, 881–82 (8th Cir. 2015) (holding that plaintiffs lacked standing to assert constitutional voting rights on behalf of others). The voters would need to assert their own voting rights. No voter is here hoping to cast a vote for Blagojevich.

Redressability might be problematic as well. The impeachment and removal by the Illinois General Assembly is not the only barrier keeping Blagojevich off the ballot. Under Illinois law, a convicted felon cannot hold public office.

The Illinois Election Code provides that "[a]ny person convicted of an infamous crime . . . shall thereafter be prohibited from holding any office of honor, trust, or profit, unless such person is again restored to such rights by the terms of a pardon for the offense, has received a restoration of rights by the Governor, or otherwise according to law." *See* 10 ILCS 5/29-15.

Illinois courts have interpreted "infamous crimes" to include conspiracy and fraud, and Blagojevich was convicted of those two crimes. *See* Judgment, *United States v. Blagojevich*, No. 8-cr-888 (N.D. Ill.), Dckt. No. 904 (showing convictions for conspiracy to corruptly solicit funds, wire fraud, and conspiracy/attempted extortion); *People ex rel. Foxx v. Agpawa*, 105 N.E.3d 846, 850 n.1 (Ill. App. Ct. 2018) ("Felony fraud offenses clearly implicate issues of common honesty and decency, and therefore constitute 'infamous crimes' as long defined under Illinois law.") (citation omitted); *People ex rel. Ward v. Tomek*, 203 N.E.2d 744, 746 (Ill. App. Ct. 1964) (holding that conspiracy is an infamous crime). Blagojevich does not challenge this provision, and the Seventh Circuit has upheld its constitutionality. *See Parker v. Lyons*, 757 F.3d 701, 707 (7th Cir. 2014), *overruled on other grounds by Hadzi-Tanovic v. Johnson*, 62 F.4th 394, 402 (7th Cir. 2023).

So, even if this Court held that the Illinois General Assembly got it all wrong during the impeachment process, it would make no difference. An independent state-law barrier stands in the way of holding public office again.

The case might not be ripe, either. Blagojevich didn't exactly file his complaint at the federal courthouse in the dead of night. He took the unusual step of calling a press conference to let the world know that he was filing a complaint.

Along the way, Blagojevich expressed doubt about whether he planned to run for office ever again. "I may or may not run for public office again. I don't have any particular plans to do it. I don't have any plans to do it. The very thought of doing all that again makes me groan."

*See* WGN News, *'Madigan Engineered This': Blagojevich Sues for Ability to Run for Office Again*, YouTube (Aug. 2, 2021), https://www.youtube.com/watch?v=GOCuvs7rKYo.

So, Blagojevich wants the ability to run for office, but he isn't sure if he wants to run for office. He might run – if given the chance – and he might not. His plans haven't fully ripened, so maybe his claim hasn't ripened, either.

A claim is not ripe for adjudication if it rests upon "contingent future events that may not occur as anticipated, or indeed may not occur at all." *See Texas v. United States*, 523 U.S. 296, 300 (1998) (citation omitted); *see also Nat'l Park Hosp. Ass'n v. Dep't of Interior*, 538 U.S. 803, 807 (2003) (explaining that the ripeness doctrine "prevent[s] the courts, through avoidance of premature adjudication, from entangling themselves in abstract disagreements," and protects other parts of the government "from judicial interference"); *Mathis v. Metro. Life Ins. Co.*, 12 F.4th 658, 664 (7th Cir. 2021) ("A case is not ripe 'when the parties point only to hypothetical, speculative, or illusory disputes as opposed to actual, concrete conflicts.'") (citation omitted); 13B Charles Alan Wright, *et al.*, Federal Practice and Procedure § 3532.2 (3d ed. Supp. 2023) ("Ripeness doctrine reflects the determination that courts should decide only 'a real, substantial controversy,' not a mere hypothetical question.") (citation omitted).

All of these problems stand in the way of his claim, before getting to the merits. And on the merits, there is trouble on the horizon.

For starters, the complaint alleges a violation of the Sixth Amendment during Blagojevich's impeachment proceeding. But the Sixth Amendment applies in criminal cases. That much clear is from the text itself. "In all criminal prosecutions, the accused shall enjoy the right to . . . be confronted with the witnesses against him; [and] to have compulsory process for obtaining witnesses in his favor[.]" *See* U.S. Const. amend. VI.

An impeachment proceeding is not a criminal prosecution. After all, Blagojevich didn't go to federal prison because of what happened in the Illinois legislature. Blagojevich went to federal prison because of what happened in the federal courthouse. Impeachment didn't lead to prison time. The Illinois General Assembly took away his job, not his liberty.[2]

Impeachment had much darker consequences in Britain during the colonial era. "British impeachment could trigger the most severe, even brutal, punishments known to the law – death (sometimes with the added savagery of drawing and quartering), forfeiture of titles and lands, attainder of blood (meaning that the defendant's disabilities passed to his heirs), imprisonment, crippling fines, banishment, and so forth. British impeachments were criminal proceedings in the sense of imposing penalties ordinarily reserved for crime, even if the defendant's conduct was not technically criminal." *See* Frank O. Bowman III, High Crimes and Misdemeanors: A History of Impeachment for the Age of Trump 93 (2019).

---

[2] That said, the Constitution vests the Senate with the power to make its own rules. *See* U.S. Const. art. I, § 5, cl. 2. So, if it wanted, the Senate could decide to give an accused public official all of the rights afforded by the Sixth Amendment.

The Framers departed from that tradition by placing a cap on the consequences of an impeachment. An impeachment, in and of itself, can't lead to prison time. "Judgment in Cases of Impeachment shall not extend further than to removal from Office, and disqualification to hold and enjoy any Office of honor, Trust or Profit under the United States: but the Party convicted shall nevertheless be liable and subject to Indictment, Trial, Judgment and Punishment, according to Law." *See* U.S. Const. art. I, § 3, cl. 7; *see also* Ill. Const. art. IV, § 14.

The Constitution expressly forbids criminal consequences from impeachment, and that reality reaffirms that impeachment is not a criminal proceeding. Impeachment is a firing, and a removal from public life. "In the popular imagination, impeachment is often treated as if conviction still leads to drawing and quartering. But it just means loss of a job. Personally devastating, to be sure . . . . But not death, imprisonment, forfeiture, financial ruin, or anything like it. Simply a return to private life." *See* Frank O. Bowman III, High Crimes and Misdemeanors: A History of Impeachment for the Age of Trump 93 (2019).

The complaint also invokes the right to due process under the Fourteenth Amendment. But scholars have questioned whether there is a right to due process at all in an impeachment proceeding, let alone a judicially enforceable right to due process. *See, e.g.*, Michael J. Gerhardt, The Federal Impeachment Process 141 (2019 ed.) ("Although the Fifth Amendment due process clause could plainly be read to apply to a situation in which an impeachable officer has been deprived of his or her 'property' interest in a governmental position, it is far from certain that this provision applies to impeachments."); James C. Phillips & John C. Yoo, *You're Fired: The Original Meaning of Presidential Impeachment*, 94 S. Cal. L. Rev. 1191, 1203 (2021) ("[T]he Constitution does not require that impeachment follow due process."). Again, the legislature has the power to create its own rules and afford as many procedural protections as it sees fit.

All of these problems, and perhaps more, stand in the way of his claim. The simple reality is that federal courts have no role to play when it comes to a state impeachment. The state legislature decided to remove Blagojevich from public life, and it is not the place of a federal court to bring him back.

The case began with great fanfare. Surrounded by microphones and cameras, with a gaggle of press in tow, Blagojevich announced to the world that he might want a sequel in public life.

The book is closed. The last page already turned, and the final chapter of his public life is over. The case never should have been filed. *Read generally* Dr. Seuss, Marvin K. Mooney Will You Please Go Now! (1972) ("The time has come. The time has come. The time is now. Just Go. Go. GO! I don't care how. You can go by foot. You can go by cow. Marvin K. Mooney, will you please go now!").

The case started with a megaphone, but it ends with a whimper. Sometimes cases in the federal courthouse attract publicity. But the courthouse is no place for a publicity stunt.

He wants back. But he's already gone. Case dismissed.

9

Date: March 21, 2024

Steven C. Seeger
United States District Judge